**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Sheldon L. Pollock**
**Wendy B. Tepperman**
**Travis Hill**
**Jonathan M. Grant**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004-2616**
**212-336-9135 (Hill)**
**Hilltr@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                    **Plaintiff,**<br><br>        -against-<br><br>**BRITE ADVISORS USA, INC.,**<br><br>                    **Defendant** | **COMPLAINT**<br><br>**23 Civ. 10212**<br><br><br>**JURY TRIAL DEMANDED** |

        Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendant Brite Advisors USA, Inc. ("Brite USA" or "Defendant"), alleges as follows:

### SUMMARY

        1.        Brite USA — a Commission-registered investment adviser with nearly

$400 million in client assets under management maintained by Brite Advisors Pty Ltd. ("Brite

Australia") — has failed and continues to fail to comply with the Commission's "Custody Rule,"

which, to ensure the safety of client assets, requires an annual report from an independent public

accountant of Brite Australia's internal controls.  In addition, Brite USA has violated and

continues to violate its fiduciary duty to its advisory clients to fully disclose conflicts of interest and risks to client assets created by Brite Australia borrowing tens of millions of dollars in loans backed (collateralized) by Brite USA's client assets.

2.     Brite USA and Brite Australia are under common control.  For purposes of the Custody Rule, Brite USA therefore has custody of Brite USA client funds and securities maintained by Brite Australia, and Brite USA thus must comply with the Custody Rule.

3.     From 2019 to present (the "Relevant Period"), Brite USA has failed to comply with the Custody Rule's requirement that it obtain or receive from Brite Australia an annual internal control report — an important safeguard that verifies client assets — from an independent public accountant registered with the Public Company Accounting Oversight Board ("PCAOB"), in violation of Section 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") and Rule 206(4)-2.

4.     In addition, Brite USA has received millions of dollars in operational funding arranged by Brite Australia's parent company, Brite Advisory Group Limited (the "Brite Group Parent"), during the Relevant Period.  This funding, in the form of regular cash wires to Brite USA from Brite Australia and other entities controlled by, or under common control with, the Brite Group Parent (together, the "Brite Group"), has been critical to Brite USA's ability to meet operating expenses.

5.     Brite USA's reliance on the Brite Group for funding creates conflicts of interest that Brite USA, as an investment adviser, has a fiduciary duty to fully and fairly disclose to its advisory clients.  Brite USA has failed to do so.

6.     Moreover, Brite USA has failed to comply with its fiduciary duty to fully disclose that, during the Relevant Period, a primary source of the funding to cover its operating expenses

has been margin loans or other debt secured by client assets, including the assets of Brite USA clients. Brite Australia's use of client assets as collateral presents additional risks and conflicts of interest that should have been disclosed.

7.      In failing to fully disclose these related risks and conflicts of interest, Brite USA breached its fiduciary duty to its advisory clients in violation of Advisers Act Section 206(2).

8.      In October 2023, Brite Australia's Australian regulator announced that it had sought and obtained an order from an Australian federal court freezing Brite Australia's assets in part because "the value of [Brite Australia's] funds under management has not been reported by any entity within the Brite Group in an audited balance sheet since December 2019."

## VIOLATIONS

9.      By virtue of the foregoing conduct and as alleged further herein, Defendant has violated Sections 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(2) and 80b-6(4)] and Rule 206(4)-2 thereunder [17 C.F.R. § 275.206(4)-2].

10.      Unless Defendant is restrained and enjoined, Defendant will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11.      The Commission brings this action pursuant to the authority conferred upon it by Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

12.      The Commission seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws and rules this Complaint alleges it has violated; (b) ordering Defendant to pay civil money penalties pursuant to Advisers Act Section 209(e) [15

U.S.C. § 80b-9(e)]; and (c) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to Advisers Act Section 214 [15 U.S.C. § 80b-14].

14.    Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

15.    Venue lies in this District under Advisers Act Section 214 [15 U.S.C. § 80b-14]. Defendant's principal office and principal place of business is in the Southern District of New York, Defendant conducts business in this District and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District.

## DEFENDANT

16.    **Brite USA** (f/k/a deVere USA, Inc., prior to January 2019) is a Florida corporation with its principal place of business in New York, New York.  Brite USA has been registered with the Commission as an investment adviser since 2013.  In its 2022 annual updating Form ADV amendment filed with the Commission on March 30, 2023, Brite USA reported regulatory assets under management of approximately $468 million.  On June 4, 2018, while the firm was named deVere USA, Inc., the Commission instituted settled administrative and cease-and-desist proceedings against the firm finding violations of Sections 206(1), 206(2), 207 and 206(4) of the Advisers Act and Rule 206(4)-7 thereunder relating to its failure to disclose compensation obtained from third-party product and service providers it recommended to clients and other violations.  The firm consented to the order without admitting or denying the

Commission's findings.  *In the Matter of deVere USA, Inc.*, Adv. Act Rel. No. 4993 (June 4, 2018).

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

17.     **Brite Group Parent** is a Hong Kong company and at all relevant times has been the parent company of Brite Australia.  The Brite Group Parent also controls or is under common control with the Brite Group, which operates worldwide as investment advisory and pension administration firms.

18.     **Brite Australia** is an Australian financial services firm with its registered principal office in Sydney, Australia, and is a direct, wholly-owned subsidiary of the Brite Group Parent.  Brite Australia is registered with and licensed by the Australian Securities & Investments Commission (the "Australian Commission") as a financial services business.

19.     **Brite Group CEO,** age 57, is a Hong Kong resident, and is the founder and chief executive officer of the Brite Group Parent.

20.     **Brite Group Executive-1**, age 56, is a resident of the United Kingdom.  At all relevant times, Brite Group Executive-1 has been the Chief Marketing Officer of the Brite Group Parent and since at least August 30, 2019, has served as a Director of the Brite Group Parent. Brite USA has reported since January 2019 that Brite Group Executive-1 is a Director of Brite USA and the direct or indirect sole owner of Brite USA.

## BACKGROUND ON THE CUSTODY RULE

21.     In Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)], Congress made it unlawful for any investment adviser to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative" using means of interstate commerce.  Congress further

directed the Commission, through "rules and regulations," to "define, and prescribe means reasonably designed to prevent, such" fraudulent, deceptive, or manipulative conduct.

22.    In 1962, the Commission adopted Rule 206(4)-2 under the Advisers Act [17 C.F.R. § 275.206(4)-2], known as the "Custody Rule," to require investment advisers who have custody of client funds or securities "to maintain them in such a way that they will be insulated from and not be jeopardized by financial reverses, including insolvency, of the investment adviser." *See* 27 Fed. Reg. 2149 (Mar. 6, 1962), available at https://www.govinfo.gov/content/pkg/FR-1962-03-06/pdf/FR-1962-03-06.pdf.

23.    Effective in 2010, the Commission amended the Custody Rule to "provide for a more robust set of controls over [investment adviser] client assets designed to prevent those assets from being lost, misused, misappropriated, or subject to advisers' financial reverses." *See* 75 Fed. Reg. 1456, at 1457 (Jan. 11, 2010), available at https://www.govinfo.gov/content/pkg/FR-2010-01-11/pdf/2010-18.pdf.

24.    Under the Custody Rule, it is a fraudulent, deceptive, or manipulative act, practice or course of business for a registered investment adviser to have custody of its clients' funds or securities unless it fully complies with all requirements of the Custody Rule.

25.    For purposes of the Custody Rule, an investment adviser has "custody" if (1) it holds, directly or indirectly, clients' funds or securities, or (2) has authority to obtain possession of them, or (3) if a "related person" holds the clients' funds or securities, or has authority to obtain them, in connection with the investment adviser's services.  17 C.F.R. § 275.206(4)-2(d)(2).

26.    The Custody Rule defines a "related person" to "mean[] any person, directly or indirectly, controlling or controlled by you, and any person that is under common control with

you."  17 C.F.R. § 275.206(4)-2(d)(7).  Under the Advisers Act, "person" means a natural person or a company.  15 U.S.C. § 80b-2(a)(16).

27.     The Custody Rule defines "control" to mean "the power, directly or indirectly, to direct the management or policies of a person, whether through ownership of securities, by contract or otherwise."  17 C.F.R. § 275. 206(4)-2(d)(1).  The rule further specifies that "[e]ach of your firm's officers, partners, or directors exercising executive responsibility (or persons having similar status or functions) is presumed to control your firm."  17 C.F.R. § 275. 206(4)-2(d)(1)(i).

28.     If an investment adviser has custody of client assets because a related company maintains the client assets as a qualified custodian, the Custody Rule requires the investment adviser to obtain— within six months of becoming subject to the requirement and after that at least once every year — an internal control report of the related company's custody controls prepared by an independent public accountant.  17 C.F.R. § 275.206(4)-2(a)(6)(ii).

29.     The Custody Rule further requires that the internal control report include an opinion as to whether controls have been placed in operation as of a specific date and are suitably designed and are operating effectively to meet control objectives relating to custodial services, including the safeguarding of funds and securities held on the clients' behalf.  The independent public accountant must verify that the funds and securities are reconciled to a custodian other than the related company.  17 C.F.R. § 275.206(4)-2(a)(6)(ii).  Put another way, the independent public accountant must confirm or test that the related company's books and records of client funds and securities match what is reported in accounts by unaffiliated entities, such as an unaffiliated broker.

30.    In addition, the Custody Rule requires that the independent public accountant who prepares the internal control report must be registered with, and subject to regular inspection by, the PCAOB.  17 C.F.R. § 275.206(4)-2(a)(6)(ii)(C).

## FACTS

### I.    Background

#### A.    Brite USA's Investment Advisory Business

31.    During the Relevant Period, Brite USA's clients have primarily consisted of United Kingdom ("U.K.") expatriates residing in the United States who previously held employment-based U.K. pensions.

32.    During the Relevant Period, Brite USA recommended to prospective advisory clients that they transfer their employment-based U.K. pension assets to a self-directed U.K. personal pension plan known as a Self-Invested Personal Pension ("SIPP"), with Brite USA serving as the investment adviser providing ongoing investment advice to the clients.

33.    Brite USA clients pay a one-time flat fee to Brite USA upon agreeing to the SIPP transfer and an annual advisory fee to Brite USA of 1% of assets under management.

34.    The Brite USA client SIPPs are administered by U.K. trustee companies, and there is a separate arrangement with a custodian firm, such as a broker or insurance company, that holds the client assets and provides securities trade execution.

35.    During the Relevant Period, in addition to advising SIPP clients, Brite USA has also advised clients who previously transferred their employment-based U.K. pensions to offshore pensions, known in the U.K. as Qualifying Recognized Overseas Pension Schemes ("QROPS"), that Brite USA recommended prior to April 2017 while operating under the deVere USA name.

36.     QROPS are structurally similar to SIPPs.  The Brite USA client QROPS are administered by trustee companies based outside of the U.K.  The custodian firms that Brite USA had previously recommended to these advisory clients were companies that typically charged such clients "establishment" fees of 1.0% to 1.1% per year over a required 10-year term in addition to other account and trade charges.  As a result, a QROPS client who elected to change custodians prior to the end of the required 10-year term incurred an "exit fee" equal to the full amount remaining to be paid over the 10-year term.

**B.     The Brite Platform and the Exit Fees**

37.     In or about August 2019, Brite USA began recommending to new clients and existing clients with SIPPs and QROPS that they move their assets to the "Brite Platform," which primarily would function as the custodian firm for Brite USA's clients.

38.     During the Relevant Period, the Brite USA client SIPP or QROPS assets have been held and traded by Brite Australia in client omnibus accounts ("Client Omnibus Accounts") – meaning accounts that hold the assets of multiple clients.  The Client Omnibus Accounts are in the name of Brite Australia and are held at the Australian subsidiary of a holding company with broker-dealer operating subsidiaries in multiple jurisdictions worldwide (the "Global Broker-Dealer").

39.     Brite Australia is responsible for entering trades on behalf of the client SIPP or QROPS and transferring funds into and out of the Client Omnibus Accounts using the Global Broker-Dealer's systems.

40.     The Global Broker-Dealer and its Australian subsidiary do not know the identities of the underlying clients or their individual holdings within the Client Omnibus Accounts.

41.     Brite Australia, the holder of the Client Omnibus Accounts, is responsible for recordkeeping as to the allocation of the funds and securities held in the Client Omnibus

Accounts and for reporting holdings and transactions to each underlying advisory client, including for Brite USA clients, and their respective SIPP or QROPS trustee.

42.     When a Brite USA client agrees to Brite USA's recommendation to move their SIPP or QROPS assets to the Brite Platform, the client's existing custodian typically liquidates any securities positions, deducts any applicable "exit fees" and/or other charges, and wires the remaining cash proceeds to the client's SIPP or QROPS trustee.

43.     The SIPP or QROPS trustee in turn wires that amount to Brite Australia's designated client bank account in Australia, where it is held before being transferred to the Client Omnibus Account for investing and custody.

44.     Similarly, when a Brite USA client requests a withdrawal, or withdrawals are needed to pay certain trustee fees a client has incurred, Brite Australia wires the funds from the Client Omnibus Account to Brite Australia's client bank account and then wires the funds to the SIPP or QROPS trustee for further distribution.

45.     During the Relevant Period, the Brite Group CEO and his wife were authorized persons — meaning they had the authority to withdraw funds or take other account actions — on the relevant Brite Australia bank accounts.

46.     Because Brite USA's QROPS clients would incur "exit fees" equal to the full amount remaining to be paid over the 10-year term for "establishment fees" by their existing custodians (as described in paragraph 36) if they switched custodians, when Brite USA began recommending that QROPS clients switch to the Brite Platform, Brite USA stated that Brite Australia would advance cash to those clients in an amount equal to their exit fee.  In turn, the client would agree to repay the amount advanced in monthly increments without interest over a period of up to 10 years.

47.     Brite USA represented that, by using this method, the client's existing QROPS assets would be fully invested on the Brite Platform, subject to the client's repayment obligation.

## II.    Brite USA, Brite Australia and the Brite Group Parent Are Under Common Control for Purposes of the Custody Rule

### A.    Brite Group Executive-1's Roles at Brite USA and the Brite Group Parent Establish Common Control

48.     Brite Group Executive-1 has been the sole Director of Brite USA since at least March 2019.

49.     From February 2019 until February 2023, Brite USA stated in all of its Form ADV filings with the Commission that Brite Group Executive-1 indirectly owned Brite USA through his sole ownership, since January 2019, of a U.K. entity currently named BAH 2021 Ltd. ("BAH 2021").  Brite USA described BAH 2021 as its sole shareholder in the same Form ADV filings.

50.     On January 3, 2023, BAH 2021 updated its U.K. corporate records to reflect that, as of December 8, 2022, BAH 2021's owner changed from Brite Group Executive-1 to a British Virgin Islands entity named Brite Advisory Holdings Limited, an entity for which the Brite Group CEO is a controlling person.

51.     On February 14, 2023, Brite USA filed a Form ADV amendment deleting BAH 2021 as its direct owner and asserting that Brite Group Executive-1 had been the direct and sole owner of Brite USA since January 2019.

52.     At all relevant times, as alleged in paragraph 20 above, Brite Group Executive-1 has also served as the Chief Marketing Officer of the Brite Group Parent.  In addition, since at least August 2019, Brite Group Executive-1 has served as one of the three or four Directors of the Brite Group Parent.

53.    In these roles, Brite Group Executive-1 has participated in regular meetings with other managers of the Brite Group Parent, including the Brite Group CEO.

54.    As alleged in paragraph 18 above, Brite Australia is a direct, wholly-owned subsidiary of the Brite Group Parent.

**B.    The Brite Group CEO and The Brite Group Parent Also Control Brite USA**

       **1.    The Brite Group Parent Arranged and Funded the Acquisition of Brite USA**

55.    In 2018 and 2019, the Brite Group Parent, led by the Brite Group CEO, embarked on a plan to expand the Brite Group's business globally, primarily through acquisitions of other investment advisory businesses and related support businesses, with a focus on U.K. expatriate clients with U.K. pension assets.

56.    To fund the expansion, the Brite Group CEO approached an affiliate of the Global Broker-Dealer (the "Global Broker-Dealer Affiliate"), seeking a $10 million credit facility for purposes of making acquisitions.

57.    To persuade the Global Broker-Dealer Affiliate to agree to the loan, the Brite Group CEO promised that he would move client assets managed by the target companies to brokerage accounts at the Global Broker-Dealer as acquisitions were made.

58.    The Brite Group CEO specifically told the Global Broker-Dealer Affiliate that Brite USA (then named deVere USA, Inc.) had over $500 million in assets under management that would be moved to the Global Broker-Dealer after the acquisition.

59.    On approximately March 15, 2019, the Global Broker-Dealer Affiliate and the Brite Group Parent executed an agreement for a loan of up to $10 million for the Brite Group Parent to make acquisitions.

60.     The terms of the loan provided that the Global Broker-Dealer Affiliate would review each proposed acquisition and determine whether to approve it before permitting the Brite Group Parent to draw down on the loan.

61.     The loan agreement was also supported by a "Subsidiary Guarantee Agreement," also dated March 15, 2019, entered into with various Brite-named entities, including BAH 2021 (then named Brite Advisors Limited).  The Brite Group CEO had previously represented to the Global Broker-Dealer Affiliate that BAH 2021 was the parent company of Brite USA, and Brite Group Executive-1 signed the "Subsidiary Guarantee Agreement" on behalf of BAH 2021 and certain other entities on that agreement.

62.     On approximately March 18, 2019, the Global Broker-Dealer Affiliate approved the Brite Group Parent's first drawdown request on the loan for $3.96 million, the acquisition price of Brite USA.  The Brite Group CEO signed the drawdown request on the Brite Group Parent's behalf.

### 2.     The Brite Group CEO and the Brite Group Parent Exercise Financial Control Over Brite USA

63.     As early as January 2019, the Brite Group CEO became a primary point of contact for Brite USA personnel regarding a variety of topics, including Brite USA's insufficient cash flow from its advisory business and the need for funding from its new owners.

64.     For example, the Brite Group CEO began regularly receiving from Brite USA requests for direct financial support to cover operating expenses.  The requests typically were sent by Brite USA's operations manager and included line-item descriptions of Brite USA's anticipated near-term expenses, its cash on hand, and a request for a cash wire in the amount of the anticipated near-term shortfall.  At the Brite Group CEO's instruction to do so, Brite USA's operations manager copied a Brite Group Parent accountant on the requests.

65.     In response to Brite USA's funding requests, the Brite Group CEO and/or the Brite Group Parent's accountant regularly arranged for sufficient funds to be wired from a bank account held by one of the Brite Group companies (typically Brite Australia) to Brite USA's bank account.

66.     Early on, the Brite Group CEO expressed concern over his lack of visibility into Brite USA's finances.  For example, on or about March 22, 2019, the Brite Group CEO responded to a funding request email from Brite USA's operations manager by stating:

> We need the US connected to Xero [the Brite Group Parent's accounting system] ASAP.
>
> I need a full run down of costs/income ASAP
>
> No idea what P&L is in the US.

67.     Acting on the Brite Group CEO's directive, Brite USA's operations manager provided the information and began making arrangements to grant the Brite Group Parent's accountant online access to Brite USA's bank accounts, its QuickBooks accounting records, and its payroll system.

68.     While Brite USA awaited access to the Brite Group Parent's Xero accounting system, Brite USA's operations manager provided detailed spreadsheets of transactions in Brite USA's bank accounts and other financial data to the Brite Group CEO.

69.     Brite USA's operations manager also assured the Brite Group CEO that he would provide monthly management reports from the Xero accounting system once Brite USA had access.

70.     In late May 2019, the Brite Group CEO sent the Brite Group Parent's accountant to New York to review Brite USA's accounts in person.

71.     By at least June 2019, Brite USA's operations manager began uploading Brite USA's financial information, including bank account transaction and expense information, into the Brite Group Parent's Xero accounting system.

72.     Brite USA's requests to the Brite Group Parent for cash infusions to meet operating expenses continued regularly, typically twice per month, and the Brite Group, including Brite Australia, has continued to provide funding to Brite USA through the present.

73.     These cash infusions have been critical to Brite USA's ability to meet payroll and other expenses.

74.     Between March 2019 and October 31, 2023, at least $16.9 million was wired from Brite Australia's bank accounts to Brite USA's bank account, and an additional approximately $2 million was wired from the bank accounts of other Brite Group companies to Brite USA's bank account.

### 3.     The Brite Group CEO and the Brite Group Parent Oversaw Brite USA's Regulatory Filings and Directed Brite USA to Offer the Brite Platform

75.     Approximately one month after the Brite Group Parent made its initial drawdown to pay for the Brite USA acquisition, the Brite Group Parent began submitting additional drawdown requests on the loan agreement to fund further business acquisitions.

76.     However, because Brite USA's advisory clients' assets had not started moving to accounts at the Global Broker-Dealer, the Global Broker-Dealer Affiliate expressed frustration with the slow pace of the asset transfers and repeatedly asked the Brite Group CEO for updates while considering whether to approve additional drawdown requests.

77.     After the Brite Group Parent submitted its second drawdown request to the Global Broker-Dealer Affiliate on approximately April 16, 2019, to acquire a financial services company based in the Czech Republic for about $650,000, a representative from the Global

Broker-Dealer Affiliate inquired of the Brite Group CEO and another executive at the Brite

Group Parent ("Brite Group Executive-2"), "Have the [Brite USA] assets moved over to you

guys yet? Let me know."

78.     On April 18, 2019, the Brite Group CEO responded, "We are waiting on updating

the [Commission Form] ADV in the US before moving assets to Brite Advisors.  This will

be finalized by the end of April."

79.     On April 23, 2019, Brite Group Executive-2 responded to the same April 16, 2019

email chain, copying the Brite Group CEO, "We're in control of [Brite USA] now and the assets

will begin to move once we have the [Global Broker-Dealer] account set up in Hong Kong,

which will start in Q2."

80.     On May 17, 2019, after repeated inquiries by the Brite Group CEO and Brite

Group Executive-2 regarding the status of the Brite Group Parent's second drawdown request,

the Global Broker-Dealer Affiliate representative responded, "We cannot send the funding until

the assets have moved to the new account.  Let me know if that has happened."

81.     The Brite Group CEO responded the same day:

> We didn't take full control of [Brite USA] until April . . . The ADV is now
> under Brite Advisors USA with 420M of AUM [assets under
> management].  We need to update the ADV to include [the Global Broker-
> Dealer] and our investment portfolios.  This will be finalized by the end of
> May and filly [sic] disclosed to clients.  The transfer process then takes
> three months and this was made clear during negotiations.  We have lined
> up 10M worth of deals including agreeing to buy 220M of AUM in South
> Africa this week.
>
> New business is going to [the Global Broker-Dealer] under our Australia
> account.  However there is no FX [foreign exchange] facility so very
> challenging.

82.     On May 23, 2019, the Global Broker-Dealer Affiliate informed the Brite Group

Parent that it would agree to its second drawdown request by saying, "It is moving forward now.

Will try to get the funds to you as soon as possible.  We are hoping that once you receive the funds, you will be able to get the AUM moved to your account more quickly than with the last transaction."

83.    Over the next several months, the Brite Group Parent made additional drawdown requests to the Global Broker-Dealer Affiliate to fund further acquisitions.

84.    The Global Broker-Dealer Affiliate continued to inquire about and express frustration with the pace of the Brite Group Parent's transfer of client assets to the Global Broker-Dealer.

85.    The Brite Group CEO and the other Brite Group Executive continued to explain that the delays were related to Brite USA's need to revise its Form ADV.  They repeatedly assured the Global Broker-Dealer Affiliate that it was progressing and that the Brite Group CEO was personally involved, noting that the Brite Group CEO had travelled to New York in June 2019 to work on Brite USA's Form ADV in person along with Brite USA's outside regulatory counsel, and again in August 2019, to facilitate the transfer of Brite USA client assets to the Global Broker-Dealer.

86.    For example, the Brite Group CEO emailed the Global Broker-Dealer Affiliate on June 27, 2019, and said, "The ADV for the US has been updated this week to include [the Global Broker-Dealer].  These are insurance assets and take 3 months to move over.  I am not buying these assets for the fun of it!  They all move to [the Global Broker-Dealer].  We have a number of deals going through which I've worked on for twelve months plus."

87.    The Global Broker-Dealer Affiliate then approved drawdowns totaling approximately $1.7 million for the Brite Group Parent to purchase a Malta QROPS trustee and a UK SIPP trustee in July 2019.

88.    After Brite USA filed an amended Commission Form ADV and ADV Disclosure

Brochure in August 2019, Brite USA began recommending the Brite Platform to clients, and

asset transfers to the Brite Platform began.

### 4.    The Brite Group CEO and the Brite Group Parent Hired Brite USA's CEO

89.    During late summer and early fall of 2019, the Brite Group CEO had numerous

phone calls with an individual who lived and worked in South Africa and flew to South Africa to

recruit the individual to be Brite USA's CEO.

90.    In November 2019, the Brite Group CEO extended a written job offer to the

individual for the Brite USA CEO position in New York, New York, written on the Brite Group

Parent letterhead, and the Brite Group CEO signed the job offer.

91.    The offer included a salary of $10,000 per month, a signing bonus, and the

potential for receiving options in the Brite Group Parent, subject to performance.

92.    The individual ("Brite USA Executive-A") accepted the offer.  Brite USA

Executive-A began working at Brite USA in March 2020 and, after an agreed-upon transition

period, took over as Brite USA's CEO in June 2020.

93.    The Brite Group Parent announced the selection and appointment of Brite USA

Executive-A as the CEO of Brite USA in a March 20, 2020 press release that Brite Group

Executive-1 drafted:

> Brite Advisors announced this week that they have appointed [Brite USA
> Executive A] as the new CEO of its US operation based in New York….
> [Brite USA Executive-A] succeeds [Brite USA Executive-B] who will
> remain with the company until the summer…. The Brite founder and group
> CEO [the Brite Group CEO] wanted a well-respected industry leader with
> international experience.  'We've been searching for the right person for a
> number of months and [Brite USA Executive-A] was the perfect fit" said
> [the Brite Group CEO]…. 'With our unique offering of best interest of the
> client we aim to be the globe's leading investment firm for UK expats and

[Brite USA Executive A] is a key part in making this happen' said [the Brite Group CEO].

94.    After joining Brite USA, Brite USA Executive-A regularly communicated with the Brite Group CEO, speaking with him an average of twice weekly by telephone.

### C.    Since 2019, Brite USA Has Violated the Custody Rule

95.    Since 2019, Brite USA has had custody of its clients' assets because Brite Australia, a "related person" under common control, has acted as a qualified custodian and has held Brite USA client assets in connection with Brite USA's advisory services to these clients.

96.    However, since 2019, Brite USA has never sought or obtained an internal control report for Brite Australia prepared by an independent public accountant registered with the PCAOB.

### III.    Brite USA Failed to Fully Disclose Risks and Conflicts of Interest Related to the Brite Platform

### A.    Brite Australia Used the Margin Feature in the Client Omnibus Accounts to Borrow Millions of Dollars

97.    From 2019 until in or about June 2021, the assets of Brite USA clients and of clients of other entities in the Brite Group were held in a single Client Omnibus Account in the name of Brite Australia at the Australian subsidiary of the Global Broker-Dealer (the "Original Omnibus Account").

98.    The Original Omnibus Account and other Client Omnibus accounts subsequently opened each have a margin feature.

99.    These margin features have provided Brite Australia with the ability to use margin to establish securities positions or to borrow funds, with the margin loan balance secured by all of the assets held in the Original Omnibus Account and in any other Brite Australia accounts at the Global Broker-Dealer.

100.    The Global Broker-Dealer can liquidate any or all of the assets in the Original Omnibus Account or any other Brite Australia account at the Global Broker-Dealer at any time without prior notice if the account does not meet margin requirements specified by the Global Broker-Dealer.

101.    The use of the margin feature in the Client Omnibus Accounts for any purpose creates a risk for all of Brite USA's clients with assets on the Brite Platform because all assets in the Client Omnibus Accounts serve as collateral for the margin loan balance.

102.    Any borrowing under the margin feature is in addition to and entirely separate from the $10 million loan agreement between the Global Broker-Dealer Affiliate and the Brite Group Parent described in paragraph 59 above.

103.    As described in more detail in the paragraphs below, the Brite Group Parent and Brite Australia have used the margin feature on the Original Omnibus Account to withdraw millions of dollars from the Original Omnibus Account to fund the Brite Group's operations worldwide, including Brite USA's operations.  Brite Australia also purportedly used the margin feature to fund cash advances Brite Australia offered to Brite USA clients with QROPS and clients of the other companies within the Brite Group, who incurred "exit fees" from their prior custodian when switching to the Brite Platform.

104.    Brite Australia has used the margin feature in the Client Omnibus Accounts for operational funding to benefit the Brite Group, including Brite USA — and not to benefit the clients whose assets have been put at risk.

105.    Similarly, a margin balance incurred to fund an exit fee advance to one client — who otherwise may not have agreed to transfer assets to the Brite Platform — provides no

benefit to clients who did not receive such advances, yet the debt is secured by all of the client assets held in the Client Omnibus Accounts.

106.    Brite USA had a fiduciary duty to disclose the risks and conflicts of interest alleged above to its advisory clients.

### 1.    Operational Funding for the Brite Group

107.    Since at least 2019, Brite USA has received approximately $19 million from Brite Australia and other companies within the Brite Group to pay its operational expenses.

108.    To meet Brite USA's operational funding needs (and to fund the operations of other Brite Group companies), Brite Australia incurred a significant margin loan balance on the Original Omnibus Account.

109.    Brite Australia typically did so by using the margin feature and initiating cash withdrawals from the Original Omnibus Account to Brite Australia's operations bank accounts, which were reflected in the Original Omnibus Account as a negative cash position.  Brite Australia then wired funds to Brite USA's bank account after the Brite Group Parent received and approved a funding request from Brite USA.

110.    Brite Australia's total margin balance in the Original Omnibus Account grew substantially over time, as depicted below:

| Date | Gross Client Assets | Margin Balance |
|---|---|---|
| June 30, 2019 | $20.45 million | ($2.87 million) |
| December 31, 2019 | $51.05 million | ($10.64 million) |
| June 30, 2020 | $94.96 million | ($11.09 million) |
| December 31, 2020 | $310.26 million | ($27.3 million) |
| May 31, 2021 | $466.29 million | ($40.21 million) |

111.    Brite Australia's use of the margin feature to fund the operational expenses of the Brite Group, including Brite USA, primarily drove this margin balance growth.

112.    Between October 30, 2019, and June 1, 2021, Brite Australia withdrew over $32 million from the Original Omnibus Account to its business operations bank accounts, approximately 80% of the total outstanding margin balance of $40.21 million as of May 31, 2021.

### 2.    Advances of "Exit Fees"

113.    In addition, Brite Australia purportedly funded cash advances of "exit fees" incurred by Brite USA clients with QROPS from their prior custodian (described above in Section I.B.) and by clients of other Brite Group companies by using the margin feature in the Original Omnibus Account prior to June 2021.

114.    Use of the margin feature to fund advances of "exit fees" makes all of the client assets in the Client Omnibus Accounts —including the assets of clients who did not receive such advances—collateral for the margin loan balance incurred.

### B.    Brite USA Was on Notice of Brite Australia's Margin Borrowing prior to June 2021 But Failed to Disclose Risks and Conflicts of Interest to Clients

115.    On May 7, 2019, in response to Brite USA's requests for information about the Brite Platform, the Brite Group Parent provided a copy of Brite Australia's clearing agreement with the Global Broker-Dealer to Brite USA's CEO at the time ("Brite USA Executive-C").

116.    The clearing agreement described margin feature privileges available on the Original Omnibus Account, including the Global Broker-Dealer's right to liquidate assets in the account without prior notice should the account fail to meet its margin requirements.

117.    That same day, Brite USA Executive-C emailed the document to other Brite USA executives, including Brite USA Executive-B, who at that time was Brite USA's General

Counsel and later served as CEO prior to the appointment of Brite USA Executive-A as CEO in or around June 2020 as described in paragraph 92 above.

118.    However, Brite USA failed to make further inquiries of the Brite Group Parent or Brite Australia regarding the margin feature and made inaccurate and misleading disclosures to its clients.

119.    Beginning in approximately August 2019, when Brite USA began recommending the Brite Platform to clients, Brite USA's Investment Advisory Agreement ("Advisory Agreement") with clients at the time included a section with respect to the Brite Platform titled "Conflicts of Interest".

120.    That section stated that Brite USA "receives or will seek to receive an advance of its [advisory fee] from [the Brite Group Parent] equal to up to five years' of annual [advisory fees] which it would cede to [the Brite Group Parent]," and the section falsely described the source of the advances as "a credit facility it [the Brite Group Parent] maintains with [the Global Broker-Dealer Affiliate], an affiliate of [the Global Broker-Dealer]."

121.    In fact, the source of funding Brite USA received from the Brite Group Parent was primarily from Brite Australia incurring a margin loan position on the Original Omnibus Account holding Brite USA's own clients' assets.

122.    By incorrectly identifying the source of funding, Brite USA failed to disclose the risks and conflicts created by the Brite Group Parent and Brite Australia borrowing against Brite USA's clients' assets to fund the operations of the Brite Group, including Brite USA.

123.    Similarly, while Brite USA's Advisory Agreement and Form ADV Brochure disclosed that Brite Australia had agreed to advance "exit fees" to clients with QROPS who incurred such fees when switching to the Brite Platform (subject to repayment by the client),

both documents omitted the important information that Brite Australia would fund any such advances of "exit fees" by incurring a margin loan balance on the Original Omnibus Account that encumbered all client assets, regardless of whether the client received an advance.

124.    On or about July 19, 2020, Brite USA Executive-B emailed Brite Group Executive-2 attaching Brite USA's most recent ADV Brochure, dated June 12, 2020, as well as a separate written set of questions.

125.    In his email and the attached set of questions, Brite USA Executive-B sought answers about conflicts of interest and comments on Brite USA's existing or draft descriptions of certain conflicts involving the Brite Platform—including Brite USA's draft description of the Brite Group Parent's use of a credit facility with the Global Broker-Dealer Affiliate to fund exit fee advances made to Brite USA clients and Brite USA's current Advisory Agreement disclosure regarding Brite USA's potential receipt of an advance of up to five years' of annual advisory fees from the Brite Group Parent.

126.    In response, on approximately July 21, 2020, Brite Group Executive-2 explained that Brite USA Executive-B appeared to misunderstand the nature of the Brite Group Parent's credit facilities with the Global Broker-Dealer.

127.    Brite Group Executive-2 noted that there were two debt structures:  (1) a credit facility to promote the growth and expansion of the Brite Group that was strictly limited to spending on acquisitions of firms within the same market sector and (2) a separate "credit facility on the master account with [the Global Broker-Dealer], where clients cash and assets are custodied."  Brite Group Executive-2 noted the credit facility on the client account was to fund both "exit fee" advances to clients and the advances of advisory fees, and that client repayments of "exit fee" advances and annual advisory fees "reduce the debt."  Brite Group Executive-2

added further, "Please note that this is **not** a margin account" (emphasis in original).

128.    Despite describing the client account as "**not** a margin account," Brite Group Executive-2 made clear the existence of a "credit facility on the master account … where clients cash and assets are custodied," i.e., the Original Omnibus Account, which, by his description, was being used both to fund exit fee advances to clients and advances of up to five years' of advisory fees to Brite USA.

129.    That same day Brite USA Executive-B forwarded the email to Brite USA Executive-A (then Brite USA's CEO) and others.

130.    Brite Group Executive-2's description of the credit facility on the Original Omnibus Account put Brite USA on notice that the Brite Group Parent, through Brite Australia, was borrowing against client assets in the Original Omnibus Account.

131.    Yet Brite USA made no further inquiries into the nature of that credit facility at that time, including as to the extent of its use and the collateral.

132.    Instead, at some point after receiving Brite Group Executive-2's July 20, 2020 email, Brite USA decided to simply delete the disclosure described in paragraph 120 above from the Advisory Agreements entered into with clients.

133.    In addition, prior to June 2021, Brite USA did not disclose to its advisory clients the existence of the margin privileges on the Original Omnibus Account or its use to incur significant margin loan balances against Brite USA client assets on the Brite Platform.

134.    Between August 2019 and May 2021, pursuant to Brite USA recommendations, Brite USA clients with at least $298 million in SIPP and QROPS assets moved their assets to the Brite Platform—all of which occurred without full and fair disclosure of the attendant risks and

conflicts of interest described above.

> **C.    Brite USA Is Still Failing to Disclose Certain Risks and Conflicts of Interest to Its Advisory Clients**

135.    In early June 2021, Brite Australia began using a new Client Omnibus Account at the Global Broker-Dealer in the name of Brite Australia (the "New US Omnibus Account") that Brite USA claims exclusively holds assets of Brite USA's clients.

136.    Under this new arrangement, Brite USA's clients' assets and associated margin loan balances are purportedly held in the New US Omnibus Account, while assets for clients of all other Brite Group entities and associated margin loan balances remained in the Original Omnibus Account.

137.    The New US Omnibus Account's margin loan balance is purportedly limited solely to the amount of advanced exit fees that is reduced by clients' monthly repayments.

138.    Despite the apparent segregation of Brite USA's clients' assets and associated margin loan balance, this arrangement does not eliminate the risks borne by Brite USA's advisory clients.  The Global Broker-Dealer is still entitled to liquidate assets in any of Brite Australia's accounts with the Global Broker-Dealer without prior notice if the Original Omnibus Account or another Client Omnibus Account fails to meet its margin requirements at any time.  As a result, Brite USA's clients' assets in the New US Omnibus Account continue to serve as collateral for margin loan balances incurred on the Original Omnibus Account.

139.    Shortly after the purported June 2021 "segregation" of the New US Omnibus Account and Original Omnibus Account, Brite USA sent its clients a new disclosure form entitled "Acknowledgement Of Omnibus Account Usage and Risks."

140.    In this form, Brite USA disclosed, for the first time, that Brite USA client assets on the Brite Platform had previously been commingled in the Original Omnibus Account with

client assets of other Brite Group companies and that Brite Australia used margin loans secured by client assets to fund both exit fee advances and the operations of the Brite Group, including those of Brite USA.

141.    This disclosure described certain risks associated with the use of margin, such as the fact that assets in any Brite Australia account at the Global Broker-Dealer could be liquidated to satisfy a margin obligation of another Brite Australia account.  However, the disclosure did not fully reveal the extent to which margin debt on the Original Omnibus Account had already funded Brite USA's operations or the extent of borrowing against the Original Omnibus Account, did not describe the extent to which Brite USA relied upon the Brite Group Parent and Brite Australia for ongoing financial support, and did not explain the related conflicts of interest.

142.    The disclosure form concluded by stating:  "Brite USA has inquired of [Brite Australia] in respect of these [Client Omnibus Account] risks and believe that the use of the [New US Omnibus Account] (including margin) is appropriate, and does not present to its clients a materially increased risk relative to individual accounts, based on [Brite Australia's] representations," which it listed as including Brite Australia's segregation of assets and liabilities to each individual account and that "[Brite Australia] performs reconciliations between account holdings on the Brite Platform and omnibus accounts each business day."  However, the disclosure failed to provide any information to clients relating to the financial condition and capacity of the Brite Group Parent and Brite Australia to repay the margin debt incurred on the Original Omnibus Account for operational funding.

143.    Moreover, Brite USA failed to disclose information on Brite Australia's use of margin in the Original Omnibus Account, which grew rapidly from June 2021 to June 2022, as depicted in the chart below:

| Date | Original Omnibus (Non-Brite USA) | | New US Omnibus (Brite USA only) | |
|---|---|---|---|---|
| | **Gross Assets** | **Margin** | **Gross Assets** | **Margin** |
| June 30, 2021 | $181.8 million | ($43.69 million) | $318.15 million | ($10.42 million) |
| Dec. 31, 2021 | $250.04 million | ($70.62 million) | $391.83 million | ($8.76 million) |
| June 30, 2022 | $260.27 million | ($88.76 million) | $341.64 million | ($10.08 million) |

144.    Because Brite USA's client assets continued to serve as collateral for margin debt in all of Brite Australia's accounts at the Global Broker-Dealer, the risks to Brite USA's clients continued to grow along with Brite Australia's overall margin debt incurred in either of the Client Omnibus Accounts.

145.    Yet Brite USA has continued to recommend the Brite Platform to clients throughout this time and continued to represent to its clients that Brite USA believes the arrangement is "appropriate" and does not present "a materially increased risk relative to individual accounts" for Brite USA clients.

146.    Overall margin debt in the Original Omnibus Account dropped substantially between June 30, 2022, and December 31, 2022, due to two large payments Brite Australia made using cash in the Original Omnibus Account to pay down the margin loan balance.

147.    Brite Australia purportedly further split the Original Omnibus Account beginning in or about March 2023 by using additional Client Omnibus Accounts to hold certain client assets previously held in the Original Omnibus Account.

## IV.    The Australian Commission Obtained a Freeze Order

148.    On October 27, 2023, the Australian Commission announced that it had obtained interim orders from an Australian federal court freezing the funds and assets of Brite Australia.

149.    According to the Australian Commission's announcement, its application for the orders was made because the Australian Commission is concerned that "the current financial

position of [Brite Australia] is unknown, as [Brite Australia] has failed to lodge with the [Australian Commission] its financial statements and auditors report for the financial year ended 30 June 2022; and the value of [Brite Australia's] funds under management has not been reported by any entity within the Brite Group in an audited balance sheet since December 2019."

150.    The announcement further states that "[the Australian Commission] sought the orders to help protect the beneficiaries of the assets under management by [Brite Australia], including the beneficiaries of those who have their pensions or superannuation funds invested on the Brite Platform."

151.    The Australian Commission subsequently announced that, on November 9, 2023, the Australian federal court appointed investigative accountants to Brite Australia "to investigate the financial position of [Brite Australia], including client funds under its management, as well as provide a report to the Court and to [the Australian Commission]," and that "[t]he asset preservation orders remain in place."

## FIRST CLAIM FOR RELIEF
### Violations of Advisers Act Section 206(2)

152.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 20, 31 through 47, 63 through 74, and 97 through 151.

153.    At all relevant times, Brite USA was an investment adviser under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)].

154.    Brite USA, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly has knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

155.    By reason of the foregoing, Brite USA, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Advisers Act Section 206(2) [15 U.S.C. § 80b-6(2)].

## SECOND CLAIM FOR RELIEF
### Violations of Advisers Act Section 206(4) and Rule 206(4)-2 Thereunder

156.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 96.

157.    At all relevant times, Brite USA has been an investment adviser registered with the Commission under Section 203 of the Advisers Act [15 U.S.C. § 80b-3].

158.    At all relevant times, Brite USA has had custody of its advisory clients' assets under the definition set forth in Rule 206(4)-2(d)(2) [17 C.F.R. § 275.206(4)-2(d)(2)].

159.    At all relevant times, Brite Australia has been a related person of Brite USA and maintained funds and securities of Brite USA clients in connection with Brite USA's advisory services to clients.

160.    Since at least August 2019, Brite USA has failed to obtain, or receive from Brite Australia, any internal control reports that comply with the requirements of Rule 206(4)-2(a)(6)(ii) [17 C.F.R. § 275.206(4)-2(a)(6)(2)].

161.    By reason of the foregoing, Brite USA, directly or indirectly, has violated and unless enjoined will again violate Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-2 thereunder [17 C.F.R. § 275.206(4)-2].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Brite USA and its agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Advisers Act Sections 206(2) and 206(4) [15 U.S.C. §§ 80b-6(2) & 80b-6(4)] and Rule 206(4)-2 thereunder [17 C.F.R. § 275.206(4)-2].

**II.**

Ordering Brite USA to pay civil monetary penalties under Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and

**III.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated:  New York, New York
            November 21, 2023

 /s/ *Antonia M. Apps*
ANTONIA M. APPS
REGIONAL DIRECTOR
Sheldon L. Pollock
Wendy B. Tepperman
Travis Hill
Jonathan M. Grant
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
212-336-9135 (Hill)
Hilltr@sec.gov